IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SHAWN RODRIGUEZ,

      Petitioner,                  No. CIV S-07-853 CHS P

      vs.

JAMES YATES, acting warden,

      Respondent.        <u>ORDER</u>

_____/

## I. INTRODUCTION

Petitioner Shawn Rodriguez is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. Both petitioner and respondent have consented to jurisdiction by United States Magistrate Judge for this habeas corpus action.

Petitioner seeks relief from convictions entered in the Placer County Superior Court on charges of kidnaping for extortion, conspiracy to commit murder, vehicle theft, and two counts of using another's name to obtain credit or property. Petitioner was sentenced to a prison term of 25 years to life plus various other shorter terms, all to be served concurrently. Petitioner presents the following five grounds for relief: (A) the trial court failed to sua sponte instruct on lesser included offenses; (B) the jury returned inconsistent verdicts; (C) the jury foreman lied during voir dire to conceal bias; (D) the sentence imposed constitutes cruel and unusual

1

punishment; and (E) the cumulative effect of these and four additional alleged errors rendered the proceedings fundamentally unfair. As explained below, petitioner is not entitled to relief on any of the claims.

## II. BACKGROUND

The following summary of evidence adduced at trial was set forth in the unpublished opinion of the California Court of Appeal, Third District, No. C045882.[1] Petitioner is the defendant referred to therein.

*The Prosecution*

Nicholas Hamman met Anna Rugg at a bus station in Auburn in July 2002. Although he did not know her well, he thought of her as his girlfriend or was thinking about making her his girlfriend. Hamman met defendant once or twice through Rugg.

On March 14, 2003, Hamman helped Rugg, defendant, and defendant's girlfriend, Erin Hughes, move into the Elmwood Motel. Defendant spent a few hours with them at their request and then left.

The next morning, as defendant was driving his red Chevy Beretta past Randy Rowdy's gas station in Auburn, Rugg, Hughes, and defendant waved at him and asked for help moving out of the motel. Hamman agreed and helped load their belongings into his car. Rugg and Hughes rode in Hamman's car while defendant rode his bicycle. In the car, Rugg told Hamman to drive to the abandoned juvenile hall off Auburn Ravine Road. Rugg argued with Hamman about directions, wanting him to follow defendant. Rugg was mad and exited the car. Hughes told Hamman to wait at the Wells Fargo Bank parking lot until defendant arrived. Defendant spoke with Rugg, brought her back to the car, and they continued to the juvenile hall. When Hamman arrived, he assumed defendant was already there. As the three unloaded some bags, defendant exited the front door of the juvenile hall. After the bags were unloaded, Hamman asked Rugg if there was anything else. A hysterical Rugg said Hughes was hurt. Hamman followed Rugg inside to a cell-like room, where Rugg said Hughes was. He ran inside but saw nothing. He heard a door creak and spun around. He stuck out his leg to prevent the door from closing but defendant kicked him in the thigh. The pain caused him to retract his leg and Rugg shut the door. Hamman could not get out because the inside

[1] Lodged in the record as Document 1 (2/8/08).

2

of the door had no handles. Rugg said she was still mad about the argument and would let him out after she calmed down. Defendant was stuffing toilet paper into the vent and said he was going to burn down the building. Defendant then left.

In hopes the fire department would respond to an alarm, Hamman used his cigarette lighter to set off the sprinkler system in the cell. For five hours, water covered the room and soaked Hamman. The fire department never responded.

Later that afternoon, defendant reappeared through a large Plexiglas window. Defendant asked for Hamman's money, ATM card, and personal identification number (PIN). When Hamman refused, defendant said he would drown. Scared, Hamman recited his PIN. Defendant and Rugg stuffed rags underneath the door and secured them with a crate. They ignored Hamman's pleas to be released. Defendant told Hamman he would drown unless he gave up his ATM card, cash, and keys. Defendant and Rugg left. As the water rose to Hamman's neck, he stepped onto a table in the cell to avoid drowning.

Defendant and Rugg reappeared one-half to two hours later. Defendant repeated his demand for Hamman's ATM card, keys, and cash. Hamman told defendant he would comply if they would let the water out of the cell. Rugg removed the rags that were blocking the cell door and the water level in the cell decreased to about four inches. Water was still coming out of the sprinkler. Defendant slid his ATM card, cash, and keys underneath the cell door. Defendant tried unsuccessfully to break the cell's Plexiglas window. Defendant and Rugg left.

Around 7:00 or 8:00 p.m. on Saturday, defendant, Rugg, and Hughes drove to the house of defendant's foster brother, Richard Romines, and asked to stay the night. Hughes stayed while defendant and Rugg left. They returned around 3:30 or 4:30 a.m. Before going to bed, defendant told Romines he thought he killed a guy at the juvenile hall. Romines thought defendant was joking.

On Sunday, defendant realized Hamman was not dead and asked Romines how many different ways there were to kill somebody. Romines, who had had a few beers and thought defendant was not serious, mentioned cement shoes and carbon monoxide. Romines explained that on television he had seen someone hook up a hose to the pipe of a car's muffler and then run the hose to a small, sealed room. Rugg was present for at least one of the discussions about carbon monoxide poisoning.

Defendant and Rugg drove to Auburn. They returned to Romines's house sometime after midnight on Monday to borrow a hacksaw to turn off the water main at the juvenile hall.

About 2:00 a.m. on Monday, defendant and Rugg drove to a Shell gasoline station in Placer County. As defendant filled gasoline in Hamman's car, Rugg asked the gas station attendant, Robert Hammer, to use the restroom. She seemed extremely nervous. While Rugg was in the restroom, defendant banged on the restroom door so Rugg would hurry. Before they left, Rugg told Hammer she accidentally had knocked over a laundry hamper in the restroom. Hammer discovered a note on top of the laundry hamper that read, "[C]all 911. We are driving his red Beretta. Nick Hamman is located in the cell at the old juvenile jail drowning. Anna Rugg. Shawn Rodriguez kidnapped me ." Hammer immediately called police.

Auburn Police Officer Gary Hopping went to the juvenile hall, where he met his shift partner, Stan Hamelin. They heard a loud banging coming from the direction of the holding cell. Water was cascading down Hamman's head and out from underneath the cell. The edges of the door were sealed with duct tape and the front of the door was barricaded with a bookcase-type object that contained paint cans. Officer Hopping helped Hamman exit the cell. Hamman, who was suffering from mild trench foot,[2] mild hypothermia, mild dehydration, and nausea, was taken to the hospital.

Officer Hopping and another deputy pulled over Hamman's Beretta that defendant was driving. Defendant had an Albertson's receipt for duct tape and an ATM balance inquiry sheet that ended with the same four digits as Hamman's ATM card. Rugg had bank withdrawal receipts for $40 each from Hamman's accounts.

Auburn Police Detective Daniel Coe interviewed defendant. He said Rugg told him the night before that she wanted to rob Hamman and defendant told her he would tag along but would not beat him down. Rugg took Hamman's keys from him, lured him into a cell, and slammed the door shut.[3] Defendant admitted blocking the door with paint cans but had second thoughts from the very beginning. Despite Hamman's pleas, defendant did not open the cell door, but tried unsuccessfully to break the window. He admitted taking $13 from Hamman and $40 from the bank account, buying duct tape and hoses with Rugg, taping the cell door, putting the hoses together, and trying to fill the cell with carbon monoxide. After running the car for 15 minutes, defendant told Rugg that Hamman must be dead, although defendant realized it would take

---

[2] Trench foot is the medical term for the condition that occurs commonly in the military when soldiers in the trenches are exposed to cold and wet conditions without a way for their feet to dry out or warm up.

[3] According to the state appellate court, at another point in the interview, petitioner said "we" put Hamman in there.

4

an hour and one-half to two hours for carbon monoxide to poison defendant. He did not want to kill Hamman.

*The Defense*

Defendant was transient after he was released from jail in January 2003 for stealing a car. On [ ] March 15, 2003, Hamman drove defendant, Hughes, and Rugg to the Salvation Army to pick up a voucher for the Elmwood Motel. Hamman stayed with them for an hour to an hour and one-half and left when defendant announced they were going to bed. Later that night, Rugg told defendant she wanted to rob Hamman of his car and ATM card. She mentioned several plans, including the old juvenile hall. Defendant was noncommittal and did not take Rugg seriously.

The next morning defendant planned to call a friend or a relative to help move their belongings out of the motel. However, when they saw Hamman driving by that morning, they waved him down. Rugg spoke with Hamman and then told defendant to get packed. Defendant planned to store his belongings at the juvenile hall for the day. After they unloaded their belongings at the juvenile hall, Rugg told Hughes and defendant to take a walk and told Hamman she wanted to show him something. As defendant walked away, he had a feeling Rugg was going to lock Hamman in a cell. Defendant heard two "slam[s]" and Rugg yelled defendant's name. Rugg was holding up Hamman's keys. Hamman was locked in the cell. Rugg told Hamman she would let him out when she was not mad at him. Defendant, Rugg, and Hughes left in Hamman's car. After stopping by Romines's house, they returned to the juvenile hall for a few minutes but left again to take Hughes back to Romines's house.

Defendant and Rugg came to an unspoken agreement to rob Hamman and went back to the juvenile hall. Rugg asked Hamman for his PIN and defendant made him repeat it 15 minutes later to verify the number's accuracy.

Rugg and defendant agreed to release Hamman after he gave them his PIN. Defendant unsuccessfully tried to break the Plexiglas window. He did not open the cell door because Hamman was going crazy.

Defendant tried to persuade Hamman to give them his ATM card. When Hamman refused, defendant and Rugg blocked the door with towels and bookcases, realizing there was a possibility Hamman might drown. When defendant returned 20 minutes later, the water had reached three feet. Defendant pulled the towels from beneath the door and Hamman slid his ATM and cash under the door.

Defendant drove Rugg to an ATM machine in Rocklin to use defendant's ATM card. They drove back to Romines's house at 2:00 or 3:00 a.m. and spent the night.

On Sunday morning, defendant's first thought was to turn off the water in the cell and release Hamman. Later that day, defendant and Rugg unsuccessfully tried to turn off the water at the juvenile hall. Rugg proposed ways to kill Hamman and dispose of his body. Defendant was noncommittal and had no intent to injure or kill Hamman.

When they returned to Romines's house, defendant told Romines he might have killed Hamman, although he knew that Hamman was alive. He and Romines discussed methods of killing a person because Rugg was intent on killing Hamman. Romines settled on the carbon monoxide idea because it left a large margin of error and would "shut [Rugg] up."

That day, Rugg purchased some hoses and defendant purchased duct tape. At the juvenile hall, defendant put one end of the hose in the vent outside Hamman's cell and Rugg put the other end on the tail pipe of the Beretta. After the car had been running for 15 minutes, defendant told Rugg that Hamman was dead. Defendant knew this could not be true but lied so they could leave.

On the way back to Romines's house to get a hacksaw to turn off the water, they stopped at the gasoline station, where Rugg left the note to the station attendant. They retrieved the hacksaw and drove down Highway 49 when they encountered the police.

(C045882 opinion at 1-4.)

### III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

## IV.  ANALYSIS OF PETITIONER'S CLAIMS

### A.    Instructional Error

Petitioner was charged with kidnaping for extortion and, in the alternative, felony false imprisonment.  The jury was not instructed on simple kidnaping as a lesser included offense to kidnaping for extortion, nor on misdemeanor false imprisonment as a lesser included offense to felony false imprisonment.  (C045882 opinion at 4-5.)  Petitioner claims this was error.  Federal habeas corpus relief is not available, however, for several reasons.

First, there is no clearly established Supreme Court authority requiring lesser included offense instructions in non-capital cases.  In 1980, the Supreme Court held that a defendant in a capital murder case has a constitutional right to have the jury instructed on a lesser included offense in certain circumstances.  *Beck v. Alabama*, 447 U.S. 625, 638 (1980).  The Court expressly reserved judgment on "whether the Due Process Clause would require the giving of such instructions in a non-capital case."  *Id*. at 638 n.14; *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993).  In the years following *Beck*, the circuits split on the question of whether due process requires lesser included offense instructions in certain instances for non-capital defendants as well.  *See Solis v. Garcia*, 219 F.3d 922 (9th Cir. 2000) (citing collected cases).  This disagreement evinces the absence of clearly established Supreme Court Authority, which precludes relief under §2254(d)(1).

Second, respondent persuasively asserts that the claim is barred by the rule announced in *Teague v. Lane*, 489 U.S. 288, 307 (1989).  "With few exceptions, the *Teague* non-retroactivity doctrine prohibits courts from announcing new rules of law in federal habeas proceedings."  *Hoffman v. Arave*, 236 F.3d 523, 537 (9th Cir. 2001), *cert. denied*, 534 U.S. 944

(2001). Where the issue has been properly raised, a federal court considering a petition for habeas corpus must conduct a threshold *Teague* analysis before considering the merits of a claim. *Horn v. Banks*, 536 U.S. 266, 272 (2002).

Petitioner's conviction became final for *Teague* purposes on June 28, 2005, ninety days after the time limit for filing a petition for writ of certiorari elapsed. 28 U.S.C. §2102(c); *see also Caspari v. Bohlen*, 510 U.S. 383 (1994). Prior to that time, the Ninth Circuit had declined the opportunity to extend the *Beck* holding to non-capital cases. *See Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984). Instead, without reference to *Beck*, the Ninth Circuit held that "the failure of a state court to instruct on a lesser included offense [in a non-capital case] fails to present a constitutional question and will not be considered in a federal habeas corpus proceeding." *Id*. at 1240 (internal quotation omitted); *see also Windham v. Markle*, 163 F.3d 1092, 1106 (9th Cir. 1998). At the time petitioner's conviction became final, and still today, neither the Ninth Circuit nor the Supreme Court has held that state courts must sua sponte instruct on lesser included offenses in non-capital cases. Such a claim impermissibly depends on the recognition of a new criminal rule and is thus foreclosed by the *Teague* doctrine. *Turner v. Marshall*, 63 F.3d 807, 819 (1995) (claim based on trial court's failure to sua sponte instruct on a lesser included offense was *Teague* barred because any finding of constitutional error would create a new rule) (*overruled on other grounds* by *Tolbert v. Page*, 182 F.3d 677).

This court may not apply a new criminal rule and must adhere to the law as it existed on June 28, 2005. *See Solis*, 219 F.3d at 929. In general, instructional error only raises a cognizable federal claim if the error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire,* 502 U.S. 62, 71-72, (1991); *see also Henderson v. Kibbe,* 431 U.S. 145, 154 (1977); *Cupp v. Nauhten,* 414 U.S. 141, 146-47 (1973). The Ninth Circuit has indicated that when a lesser included offense instruction was consistent with the defendant's theory of the case and was requested but denied, there could potentially be a cognizable habeas corpus claim. *Bashor*, 730 F.2d at 1240. In this case, however, the

instructions were not requested (RT at 646-47, 783), nor were they consistent with the defendant's theory of the case. As the California Court of Appeal concluded, there was insufficient evidence to warrant giving either lesser included offense instruction at issue:

> False imprisonment is the unlawful violation of the personal liberty of another. False imprisonment becomes felonious when it is effected by violence, menace, fraud, or deceit. "Violence" means the use of force beyond that required for simple restraint. "Menace" means the threat of harm express or implied by word or act.
>
> Under any version of events, defendant used violence or menace to prevent Hamman from leaving the cell. Defendant blocked the cell door with paint cans, bookcases, and towels, refused to open the cell door, and later tried to pump carbon monoxide into the cell. This record would not have supported a jury finding that defendant unlawfully restrained Hamman without violence or menace, to constitute misdemeanor false imprisonment...
>
> ...There was no evidence that the offense was less than aggravated kidnaping. Defendant knew of Rugg's plan to rob Hamman. Defendant demanded Hamman's ATM card and money and blocked the cell door when Hamman initially did not acquiesce in the demand for his property. Further, defendant and Rugg took defendant's cash, drove Hamman's car without his permission, and used his ATM card to withdraw money from Hamman's account. In the absence of any evidence that the offense was less than aggravated kidnaping, the trial court did not err in not instructing the jury on the lesser offense of simple kidnaping.

(C045882 opinion at 5 (internal citations omitted).)

As the state appellate court set forth, the evidence was clear that petitioner used violence or menace to imprison the victim and that the kidnaping involved extortion. The omission of lesser included offense instructions on misdemeanor false imprisonment and simple kidnaping did not violate his due process rights or otherwise deprive him of a fair trial. For this reason and the others set forth above, petitioner is not entitled to relief on his claim of instructional error.

### B.    Inconsistent Verdicts

The jury found petitioner guilty of conspiracy to commit murder but was unable to reach a unanimous verdict on the charge of attempted murder. (CT at 316, 340.) Petitioner

alleges that his conviction for conspiracy to commit murder must be reversed as inconsistent with the jury's inability to reach a verdict on the charge of attempted murder.

Petitioner's claim fails because the United States Supreme Court has held that inconsistent verdicts are constitutionally tolerable. *Dowling v. Unites States*, 493 U.S. 342, 353-54 (1990) (*citing Standefer v. United States*, 447 U.S. 10, 25 (1980). The Court has made clear that inconsistent verdicts may stand even when one of the verdicts is a conviction and the other is an acquittal. *Ferrizz v. Giurbino*, 432 F.3d 990, 992 (9th Cir. 2005) (*citing Unites States v. Powell*, 469 U.S. 57, 65 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932). The rationale for the rule is that the acquittal may be an exercise of leniency by the jury not necessarily grounded in its view of the evidence. *Ferrizz*, 432 F.3d at 993. Thus, even assuming that the jury's finding that petitioner was guilty of conspiracy to commit murder was inconsistent with the finding that he was innocent of attempted murder, there was no violation of his constitutional rights. As stated in *Standefer*, "while symmetry of the results may be intellectually satisfying, it is not required." *Standefer*, 447 U.S. at 25.

Moreover, the verdicts were not inconsistent. As the California Court of Appeal determined:

> Conspiracy is an inchoate crime. It does not require the commission of the substantive offense that is the object of the conspiracy. As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime, and thus reaches further back into preparatory conduct than attempt.
>
> The jury's guilty verdict on the charge of conspiracy to commit murder is not inconsistent with the jury's inability to reach a verdict on the charge of attempted murder. The jury could have found defendant guilty of the conspiracy based on evidence defendant and Rugg bought duct tape and hoses, used the duct tape to secure the door of the cell, and attached the hose from the cell to the car.
>
> At the same time, the jury could have harbored doubts defendant attempted to kill Hamman because defendant believed 15 minutes of carbon monoxide poisoning would not kill defendant. The jury was instructed that the act constituted an attempt only if it was an

immediate step in the present execution of the killing. (CALJIC No. 8.66.) We presume the jury followed the instruction. Moreover, consistent with the law, the People argued to the jury that once defendant committed an overt act in furtherance of the conspiracy, defendant did not have to actually attempt to kill Hamman. The verdicts are not inconsistent.

(C045882 opinion at 5-6.) Petitioner is not entitled to relief on this claim

C.    Juror Bias

The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors. The bias of even a single juror could violate an individual's right to a fair trail. *Estrada v. Scribner*, 512 F.3d 1227, 1239 (9th Cir. 2008) (*citing McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). Petitioner alleges that the juror who served as foreman at his trial lied during voir dire to conceal his bias. As evidence, petitioner has submitted a February 1, 2006 newspaper article from the Auburn Journal which reported, in relevant part, as follows:

Jury Foreman Bob Stefun, 66, of Roseville, said a videotaped interview by Auburn Police detectives of Rodriguez proved crucial during the five days of deliberations...

...The foreman said jurors weren't swayed by arguments that Rodriguez, who stayed at the Elmwood Motel in Auburn the day before the 40-hour confinement of the victim began, was looking for a place for his pregnant girlfriend to stay and went along with Rugg because he had little choice.

"It didn't seem to sway the jury," Stefun said.

Stefun said his father was a federal prison warden. Some people make the right choice and avoid crimes and others don't, Stefun said.

(Lodged Doc. 13 at 38.) Petitioner contends the juror's reported statement that some people make the right choice and avoid crimes and others don't, as well as the fact that his father was a federal prison warden, demonstrate his bias.

Prior to trial, Jury Foreman Stefun had indicated 'no' in response to a question on a form filled out by all prospective jurors, asking "Do you have any close family members or

11

friends involved in law enforcement or related occupation; yes or no?" (RT at 781.) Petitioner alleges that he intentionally lied in order to conceal his bias and remain on the jury.

In denying the defense's motion for a new trial, the trial judge reasoned with respect to the juror's father's occupation and the voir dire proceedings that

> [t]his particular gentleman was retired himself and appeared to be in his late 60's, early 70's. If his father was still alive and if he was a warden, him answering no to that question would be true. He is currently not involved in law enforcement. It doesn't ask have you ever been, and he seems to be a fair juror. So I want to clarify that for the record...
>
> ...The Court does not find evidence of juror misconduct. [ ] [T]he statement in and of itself does not reflect bias. Just because the gentleman's father was a prison warden probably 40 plus or minus years ago does not mean he was biased against the defendant. It is certainly not clear that a prison warden would even be considered by a lay person to be someone in law enforcement. And I think the People correctly point out that the jury questionnaire says "--do you have," which would seem to suggest someone who is currently alive. And this gentleman was, as I recall-- I believe the People are correct that he was at least 70 years of age, and the person we're talking about was his father.
>
> Also there were no direct questions of this juror. The defense is correct that there was a general question presented to all of the jurors as we routinely do, and they are expected to answer, but he wasn't specifically approached about that particular area. The Court cannot find that a false statement was made by the juror.

(RT at 781-782.)

The constitutional standard for juror impartiality requires the juror to be able to "lay aside his opinion and render a verdict based on the evidence presented in court." *See Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984). "[W]hether a juror can in fact do that is a determination to which habeas courts owe special deference;" there is a statutory presumption of correctness to the trial court's resolution of the question. *Id*. at 1037-1038.

Juror bias is properly analyzed under two distinct theories, actual bias and implied bias. *Estrada*, 512 F.3d at 1239-40. Actual bias, or bias in fact, is the existence of a state of mind that leads to an inference that the person will not act with entire impartiality. *See Id*. To

12

show actual bias, a "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 556 (1984).   The focus is on the juror's truthfulness; a "mistaken, though honest, response to a question" will not demonstrate bias. *See Id*. at 555.   The question for this court on habeas corpus review is simply whether the trial court's determination that the juror was not biased was "fairly supported by the record." *Wainwright v. Witt*, 469 U.S. 412, 431 (1985).

In this case, it does not appear that the jury foreman was dishonest or untruthful about the fact that his father was a prison warden.   The juror was not asked if any member of his family was *ever* in law enforcement.   In addition, as argued by the prosecutor, "a lay person may not think of a prison warden as a law enforcement position.   A warden gets inmates after arrest and conviction.   They do not have the usual function of police officers with regard to arrest and the finding of guilt; they have more of a social work function in caring for the needs of inmates." (CT at 386.)   *See generally McDonough*, 464 U.S. at 555 (observing that "jurors are not necessarily experts in English usage" and "may be uncertain as to the meaning of terms that are relatively easily understood by lawyers and judges").   Contrary to petitioner's argument, it has not been shown that there was a valid basis for a voir dire challenge for cause with respect to the jury foreman.   The state trial court properly found that the foreman's statement that his father was a prison warden does not reflect actual bias.   Notably, the juror responded affirmatively to the question: "Do you feel you could be fair to both sides in this case?"  (CT at 402.)

A claim of implied bias also fails.   In "extraordinary cases, courts may presume bias based on the circumstances." *Estrada*, 512 F.3d at 1240.   The Ninth Circuit has indicated four instructive fact situations where juror bias might be implied:

> (1) where the juror is apprised of such prejudicial information about the defendant that the court deems it highly unlikely that he can exercise independent judgment even if the juror states he will, (2) the existence of certain relationships between the juror and the defendant, (3) where a juror or his close relatives have been

> personally involved in a situation involving a similar fact pattern, and (4) where it is revealed that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participates in the trial or that the juror was a witness or somehow involved in the underlying transaction.

*Id*. None of these situations apply here. If indeed the juror's father was a prison warden, that is not sufficiently significant to allow a finding of implied bias. *See Tinsley v. Borg*, 895 F.2d 520, 529 (9th Cir. 1990) (declining to find bias in rape trial where a juror had counseled rape victims because neither the juror nor a close relative had been a victim of rape); *see also Fuller v. Bowersox*, 202 F.3d 1053, 1058 (8th Cir. 2000) (fact that juror had worked in law enforcement too speculative to allow a presumption of bias).

The trial court's determination that the jury foreman at petitioner's trial was not biased is fairly supported by the record. Petitioner is not entitled to relief on his claim of juror bias.

D.     Sentence Imposed

Petitioner was sentenced to a prison term of 25 years to life for the murder conspiracy, seven years to life for the kidnaping, plus two additional terms of two years for the charges of using another's name.[4] All terms were imposed concurrently. (CT at 467-70.) Petitioner claims that a sentence of 25 years to life for kidnaping for extortion, conspiracy to commit murder, vehicle theft, and two counts of using another's name to obtain credit or property constitutes cruel and unusual punishment.

In *Lockyer v. Andrade*, 538 U.S. 63 (2003), the United States Supreme Court held that in addressing an Eighth Amendment challenge to a prison sentence, the "only relevant clearly established law [ ] is the gross disproportionality principle, the precise contours of which are unclear and applicable only in the 'exceedingly rare' and 'extreme' case." *Id*. at 73 (*citing Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991); *Solem v. Helm*, 463 U.S. 277, 290 (1983);

---

[4] Sentencing for the vehicle theft was stayed.

and *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)).  The Court concluded that two consecutive 25 years to life sentences with the possibility of parole, imposed under California's Three Strikes Law following two petty theft convictions with priors, did not amount to cruel and unusual punishment.  *Andrade*, 538 U.S. at 77; *see also Ewing v. California*, 538 U.S. 11 (2003) (upholding sentence of 25 years to life imposed for felony grand theft); *Harmelin v. Michegan*, 501 U.S. 957 (1991) (upholding sentence of life without the possibility for parole for a first time offense of possession of a substantial amount of cocaine).

       "The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing*, 538 U.S. at 21.  Where the crime is violent or especially grave, a life sentence without the possibility of parole is constitutional.  *Harmelin*, 501 U.S. at 1002, 1004 (Kennedy, J. concurring).  According to the facts as determined by the California Court of Appeal, petitioner's crime was both violent and especially grave.  He assisted Rugg in locking Hamman into the cell for two days by kicking Hamman in the thigh so that Hamman could not prevent the door from closing.  (C045882 opinion at 3.)  He stuffed toilet paper into the vent and said he was going to burn down the building.  *Id.*  Later, petitioner demanded Hamman's money, ATM card, and PIN. *Id.*  When Hamman refused, petitioner said he would drown.  *Id.*  Petitioner and Rugg stuffed rags underneath the door and secured them with a crate.  *Id.*  Petitioner admitted blocking the door with paint cans, towels, and bookcases, realizing there was a possibility that Hamman could drown.  *Id.*  He also admitted buying duct tape and hoses with Rugg, taping the cell door, putting the hoses together, and directing carbon monoxide into the cell.  *Id.*

       Considering the sentences imposed and upheld in *Lockyer*, *Andrade*, *Ewing*, and *Harmelin*, petitioner's sentence of 25 years to life for kidnaping for extortion, conspiracy to commit murder, vehicle theft, and two counts of using another's name to obtain credit or property does not fall within the type of "exceedingly rare" circumstances that would violate the Eighth Amendment.

1          E.      Cumulative Error

2          The Ninth Circuit has concluded that under clearly established precedent of the

3   United States Supreme Court, the combined effect of multiple trial errors may give rise to a due

4   process violation if the trial was rendered fundamentally unfair, even where each error

5   considered individually would not require reversal.  *Parle v. Runnels*, 505 F.3d 922, 927 (9th.

6   Cir. 2007) (*citing Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) and *Chambers v.*

7   *Mississippi*, 410 U.S. 284, 290 (1973)).  "The fundamental question in determining whether the

8   combined effect of trial errors violated a defendant's due process rights is whether the errors

9   rendered the criminal defense 'far less persuasive,' *Chambers*, 410 U.S. at 294, and thereby had a

10  'substantial and injurious effect or influence' on the jury's verdict."  *Parle*, 505 F.3d at 927

11  (*quoting Brecht*, 507 U.S. at 637).

12          Each of petitioner's claimed errors that was separately alleged has been addressed

13  and it has been concluded that there was no error of constitutional magnitude.  Moreover, the

14  alleged errors, even when considered together, did not render petitioner's defense "far less

15  persuasive," nor did they have a "substantial and injurious effect or influence on the jury's

16  verdict."

17          Petitioner's cumulative error claim, however, is based on more than the four

18  claims already presented and rejected in this opinion.  As part of his cumulative error claim,

19  petitioner raises four additional grounds not independently addressed in his petition or this

20  opinion.  With one exception,[5] these grounds were separately raised and addressed in the petition

21

22          [5] There is one discrepancy between the claim presented in petitioner's federal petition and
    that presented in his state petition.  In his federal petition, he alleges that one of the four items of
23  evidence that the prosecutor allegedly withheld from discovery was an "extremely large knife
    recovered from co-defendant Rugg's car-seat (sic), relevant to threats made to [petitioner] and
24  witness Erin Hughes."  (Petition at 14) (emphasis in original).  In his state petition (ground 3), he
    instead alleged that the fourth item allegedly withheld by the prosecutor was a "plumbing
25  fixture" relevant to his explanation regarding "his attempt to damage the window to let the victim
    get himself free."  (Lodged document 13 at 7, 47.)  While it is thus questionable whether
26  petitioner properly exhausted the particular portion of this claim regarding the knife, this court
    can still decide the claim on its merits because it is patently frivolous.  *Gutierrez v. Griggs*, 695

for writ of habeas corpus filed in the California Supreme Court.[6]

The additional grounds that make up petitioner's cumulative error claim are (1) that the prosecution failed to produce exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) that his confession was involuntary and the product of coercion; (3) that he was denied his right to present a complete defense; and (4) that he was denied or limited in his right to present the testimony of witness Erin Hughes due to prosecutorial misconduct. Respondent asserts that petitioner's decision not to raise these grounds separately demonstrates that even he does not consider them to have much, if any, merit. Nevertheless, they should be addressed as part of the cumulative error claim, because the focus of this court's analysis must be "the overall effect of all the errors in the context of the evidence introduced at trial." *Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003) (holding also that "errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair").

1.      *Brady* disclosure

In *Brady v. Maryland*, the United States Supreme Court held that the suppression before trial of requested evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. 83 (1963).

Petitioner alleges that the prosecution withheld four items from discovery, which he describes as follows: (a) "V.H.S. tape from Shell station directly impeaching the testimony of Robert Hammer, who described [petitioner] as violent, loud and demanding"; (b) "one latent fingerprint lifted from the window sill where [petitioner] told detectives it would be from his

---

F.2d 1195, 1198 (9th Cir. 1983) ("a district court may dismiss a habeas petition without resolving whether a petitioner has exhausted available state remedies when on the face of the petition it is obvious that the petition lacks merit").

[6] Lodged document 13 (2/08/08).

17

attempts to create an escape opportunity for victim Hamman"; (c) Hacksaw supporting [petitioner's] defense that he didn't know the door would open, so he was going to cut the pipes to shut the water off and cut the hinges off the door to free the victim"; and (d) "extremely large knife recovered from co-defendant Rugg's car seat, relevant to threats made to [petitioner] and witness Erin Hughes".

The main problem with petitioner's first additional ground is that the claimed exculpatory evidence was not material. In the *Brady* context, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. The relevant question is whether, in its absence of the information, petitioner received a fair trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The proper focus is whether the net effect of the undisclosed evidence undermined the outcome of the trial. *Id*. at 421, 436-37; *see also United States v. Sarno*, 73 F.3d 1470, 1506-07 (9th Cir. 1995) (undisclosed evidence "tugs at loose threads hanging from the margins of the Government's case, but in no way challenges the bulk of the evidence on which the convictions rest").

There appears no reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense and presented at trial. For example, the question whether or not petitioner was loud and demanding while in the Shell station has little or no bearing on the actual question of his guilt on the charged offenses. Likewise, various inferences could be drawn from the existence of his fingerprint near a window at the abandoned facility; the jury could have believed his story that he tried to help the victim escape, or could have inferred that petitioner simply checked the window to make sure that the victim could *not* escape. With respect to the knife and hacksaw, both items were recovered from the interior of the victim's car in which petitioner and Rugg had been riding. (RT at 360.) The jury heard Detective Hutchins' testimony to this effect, and saw a photograph depicting where each item was found. (RT at 360.) Admitting the specific items into evidence was not necessary

1   in order for the jury to consider their significance.

2          The alleged undisclosed evidence set forth by petitioner in no way challenges the

3   bulk of evidence his conviction rests upon.  Petitioner received a fair trial and there is no

4   reasonable probability that the result of the proceeding would have been any different had this

5   evidence been available to the defense.  The Placer County Superior Court was correct in its

6   determination that petitioner was not prejudiced by the alleged *Brady* violations.  (Lodged

7   document 8, at 2-3.)

8                    2.      Involuntary/ coerced confession

9          For his second additional ground to the cumulative error claim, petitioner alleges

10  that his confession was involuntary and obtained through police coercion.  Specifically, petitioner

11  alleges that

12         Upon arrest, [petitioner] informed police that "Everything you need
           is on my I.D. Take me to jail."  This was at approximately 2:30.
13         Arresting officer Gary Hopping in his arrest report noted that
           [petitioner] was very wet.  Instead of taking [petitioner] to jail, the
14         police [took petitioner] to a substation where his handcuffs were
           anchored to a bench seat.  Next to an open door [petitioner] was
15         forced to sit, hands bolted to a seat behind his back, in an unheated
           room, soaking wet, in March at 2:30 a.m. next to an open door,
16         shaking from cold, unallowed to eat, sleep, use the restroom or see
           a lawyer, [petitioner] was told that he couldn't go to jail until he
17         spoke with Detectives. [Petitioner] has suffered acid reflux and
           other ulcer related symptoms since he was 15.  At approximately
18         3:15, [petitioner] began to suffer from acid reflux.  He requested
           water and food from his property.  These requests were denied,
19         until he was told, he felt like confessing to detectives.  In the
           interim, several officers took their turns telling [petitioner] how he
20         would spend the rest of his life in jail for what he did, most notably
           Detective Dale Hutchins, who announced to [petitioner] and
21         Officer Gary Hopping that he would be retired before [petitioner]
           would even be eligible for parole.
22
           At approximately 6:30, [petitioner] gave in to use the restroom, by
23         telling Detective Coe he wanted to talk.  In return for his
           cooperation [petitioner] was allowed to urinate, receive bread and
24         [water], and was [released from the handcuffs].

25  (Petition at 14-15.)

26  /////

                                            19

1    The United States Constitution demands that confessions be made voluntarily in

2    order to be admissible at trial.  *Lego v. Twomey*, 404 U.S. 477, 478 (1972).  A confession is

3    voluntary if it is "the product of a rational intellect and a free will."  *Medeiros v. Shimoda*, 889

4    F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)); *see also*

5    *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  The test for voluntariness, however, is not a

6    simple question of whether the suspect spoke of free will.  Rather, "coercive police activity is a

7    necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the

8    Due Process Clause of the Fourteenth Amendment."  *Colorado v. Connelly*, 479 U.S. 157, 167

9    (1986).

10    The relevant question is whether it appears, by preponderance of the evidence,

11    that petitioner's statements were the result of his will being overborne by coercive police

12    conduct.  *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991) (whether suspect's statement is "the

13    product of coercion" by law enforcement depends on whether his "will was overborne");

14    *Connelly*, 479 U.S. at 168 (reaffirming that "the voluntariness of a confession need only be

15    established by a preponderance of the evidence").  The inquiry must be based on the totality of

16    the circumstances.  *See Winthrow v. Williams*, 507 U.S. 680, 711-12 (1993).  Relevant factors to

17    consider may include the youth of the accused, lack of education, low intelligence, lack of advice

18    to the accused of his constitutional rights, the length of detention, the repeated and prolonged

19    nature of the questioning, or the use of physical punishment such as deprivation of food or sleep).

20    *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

21    Detective Coe testified that he first spoke with petitioner at approximately 6:00

22    a.m. on the morning of the arrest.  (RT at 452.)  He described the area where petitioner was held

23    as a "pretty simple room" with "a bench on one side with a bolt in the wall [for handcuffing

24    arrestees] to protect us so we can do report writing or whatever we need to get done before we

25    take them to the jail."  (RT at 450.)  Detective Coe testified that it was not unusual for a suspect

26    to wait the amount of time that petitioner waited before being interviewed, especially in a case

with multiple victims, witnesses, or suspects.  (RT at 456.)  He stated that other officers might have been in the area (RT at 450-51), but he was not aware of what any other officers said to petitioner.  (RT at 453.)

Coe testified that he began to advise petitioner of his *Miranda* rights, but stopped when petitioner indicated that he did not want to talk.  *Id*.  Approximately ten minutes later, petitioner initiated conversation with Detective Coe, asking what charges he was facing.  (RT at 452-53.)  Petitioner states that he subsequently participated in an interview that lasted approximately one and one half hours.  Due to technical difficulties,[7] there were "scratchy" portions in the tape during which the conversation could not be understood or accurately transcribed.  (RT at 396.)  Detective Coe testified that, despite the scratchy portions, nothing material or substantial was missing from the tape recording.  (RT at 448.)

The transcript of this interview is lodged in this record.  (Augmented CT at 1-22.) It began:

> DC: Okay, Sean (sic), I previously advised you of your right to remain silent and you said that you didn't want to talk to me, but now you do.  Okay?  So, now I've got to finish the rights, okay?  Okay let me just go through them, I'll go through them all again okay?  They require yes or no answers.  You have the right to remain silent, do you understand?
>
> [Petitioner:] Yes.
>
> DC: Anything you say may be used against you in court.  Do you understand?
>
> [Petitioner:] Yes.
>
> DC: You have the right to the presence of an attorney before and during questioning.  Do you understand?
>
> [Petitioner:] Yes, sir.
>
> DC: If you cannot afford an attorney, one will be appointed for you, free of charge, before any questioning if you want.  Do you

---

[7] Detective Coe explained that the recording equipment was new at the time and they were not yet aware that police radios in close proximity could cause scratchy interference.

1    understand?

2    [Petitioner:] Yes.

3    DC: Okay, you understand all of those rights that I just read to
     you? Okay. It is the 17th and it is 6:33 in the morning. Okay Sean
4    (sic), why don't you tell me in your own words why you're here.

5    (Augmented CT at 1.) Petitioner proceeded to give a detailed account of the entire incident, with

6    little to no prompting by Coe, after which time he answered several specific questions posed by

7    Coe. (Augmented CT at 1-5.) At one point, petitioner expressed hesitation about answering

8    certain questions:

9    DC: That's when you got the duct tape and sealed it up and stuff
     like that? And you sealed it up so the water wouldn't rush into the
10   room?

11   [Petitioner:] 'Cause if I'm gonna cut the pipe over the door, I don't
     want it goin' straight back in the room (?) Down there.

12
     DC: Tell me about-
13
     [Petitioner:] I know where it's going, It's not what it looks like.
14   You can stop questioning right here. I don't know what to say
     about that.
15
     DC: Do you want me to stop questioning you about the duct tape or
16   can I still ask you other stuff?

17   [Petitioner:] Depends on what it's about.

18   DC: Why would I ask you-

19   [Petitioner:]  -I can refuse to answer certain questions, can't I?

20   DC: That's your right.

21   [Petitioner:] (unclear)

22   DC: That's your right.

23   [Petitioner:] Yeah.

24   DC: Definitely your right.

25   [Petitioner:] Okay.

26   DC: Where's Erin at now?

[Petitioner:] That is something I am not willing to disclose.

DC: Okay.

[Petitioner:] This has nothing to do with her.  (???)

DC: I understand that, but I'm still going to have to talk with her. I'm not looking at her as being in trouble.

[Petitioner:] (unclear)

DC: Right now.

[Another detective in the room:] We need to determine whether he wants to talk or not, to you.

DC: You want to talk any more period?

[Petitioner:] Not about her or what's in the trunk.[8]

DC: Not about her or what's in the trunk?

[Petitioner:] Neither of those two.  Neither.  I will not speak about Erin.

DC: Okay.

(Augmented CT at 5-6.)  After that, the interview continued and petitioner answered all other questions posed.

Considering the relevant factors under *Schneckloth* and the totality of circumstances of petitioner's detention apparent from the record, it does not appear that petitioner's statements were the result of his will being overborne by coercive police conduct.  To the contrary, it appeared that he spoke freely, of his own will, on all subjects except regarding Erin, and the contents of the trunk.  Petitioner's decision to exercise his rights with respect to these two specific topics indicates that his overall statements were given with rational intellect and a free will.  Moreover, many of petitioner's specific allegations are unsupported by the record.  There is no evidence of coercive police conduct.  *See generally Connelly*, 479 U.S. at

---

[8] The hoses apparently used to divert carbon monoxide into the holding cell were recovered from the trunk of the car.

164 (noting that all Supreme Court decisions finding a confession to be involuntary "have contained a *substantial* element of coercive police conduct") (emphasis added); *see also, e.g.*, *Mincey v. Arizona,* 437 U.S. 385 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald v. Wisconsin,* 390 U.S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Beecher v. Alabama,* 389 U.S. 35 (1967) (police officers held gun to the head of wounded confessant to extract confession); *Davis v. North Carolina,* 384 U.S. 737 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Reck v. Pate,* 367 U.S. 433 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe v. Connecticut,* 367 U.S. 568 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics).

Petitioner has failed to demonstrate that his confession was involuntary or the product of coercive tactics by law enforcement.

### 3. Right to present a complete defense

Petitioner's third additional ground to the cumulative error claim is that he was denied his right to present a complete defense regarding prior acts of co-defendant Anna Rugg. Specifically, petitioner alleges that Rugg had a history and pattern of "setting up" young men to take the blame for her criminal actions. Petitioner complains that the trial judge excluded the testimony of several witnesses about past occurrences which were similar to the charged offenses.

Because a violation of state law does not ordinarily provide a basis for habeas relief (*Estelle*, 502 U.S. at 67-68), the state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it rendered the state proceedings so fundamentally unfair as to violate due process. *Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000), *cert. denied*, 532 U.S. 984 (2001); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999). Criminal defendants have a fundamental due process right, implicit in the Sixth Amendment, to present a defense.

1  *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky*, 476 U.S. 683, 690

2  (1986).  That right, however, is not unlimited.  *Greene v. Lambert*, 288 F.3d 1081, 1090 (9th Cir.

3  2002).  A state law justification for exclusion of evidence does not abridge a criminal defendant's

4  right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a

5  weighty interest of the accused."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Crane*,

6  476 U.S. at 689-91 (discussing the tension between the discretion of state courts to exclude

7  evidence at trial and the federal constitutional right to "present a complete defense").

8          When evidence in a state proceeding has been excluded pursuant to an evidentiary

9  law, the Ninth Circuit uses a balancing test:

10                In weighing the importance of evidence offered by a defendant
              against the state's interest in exclusion, the court should consider
11             the probative value of the evidence on the central issue; its
              reliability; whether it is capable of evaluation by the trier of fact;
12             whether it is the sole evidence on the issue or merely cumulative;
              and whether it constitutes a major part of the attempted defense.  A
13             court must also consider the purpose of the [evidentiary] rule; its
              importance; how well the rule implements its purpose; and how
14             well the purpose applies to the case at hand.  The court must give
              due weight to the substantial state interest in preserving orderly
15             trials, in judicial efficiency, and in excluding unreliable or
              prejudicial evidence.

16

17  *Alcala v. Woodford*, 334 F.3d 862, 877 (9th cir. 2003) (quoting *Miller v. Stagner*, 757 F.2d 988,

18  994 (9th Cir. 1985)); *see also Perry v. Rushen*, 713 F.2d 1447, 1452-53 (9th Cir. 1983), *cert.*

19  *denied*, 469 U.S. 838 (1984).

20          At petitioner's trial, the defense sought to present the testimony of six witnesses

21  regarding prior occasions when Rugg purportedly sought the services of young men to commit

22  theft and assaultive crimes in accordance with plans she devised.  (CT at 193.)  In addition, the

23  defense wished to point to prior instances in which Rugg falsely blamed others for crimes she

24  committed.  (CT at 193-94.)  In this regard, the defense claimed that petitioner's participation in

25  the commitment offenses was based not on a desire to kill the victim, but rather, to prevent

26  retaliation and false blame from Rugg, whom petitioner knew was capable of taking such

recourse.  (CT at 194.)

The trial court considered the proposed testimony of six defense witnesses, but ultimately ruled the evidence of Rugg's past conduct inadmissible:

> In the Grimes and Welty instances, the co-defendant purportedly sought the services of a young man to commit a crime and both young men declined.  Thereafter, the co-defendant committed the crime and when caught, she falsely blamed the young men.  As to the Cypert instance, the co-defendant purportedly sought the services of the witness to rob and assault her stepfather.  The witness initially agreed and then backed out.  The co-defendant purportedly stated he would regret it if he ever reported the incident.  As to witness Hand, he was reportedly asked to participate in three different robberies: (1) a robbery of Mr. Hannam (sic), the victim herein; (2) a robbery of a radio shack; and (3) the robbery of a trailer park manager.  On all occasions the witness declined to participate.  There is no indication that the crimes went forward.  Thereafter, the co-defendant purportedly gave the witness a substance she said was methamphetamine but which the witness believed was Draino, leading the witness to believe she was trying to kill him.  Lastly, the co-defendant was arrested a few weeks before the present case for a first-degree burglary and auto theft in Yolo County.  She purportedly falsely alleged that two other young men forced her to commit the crime against her will.

> Viewed in the light most favorable to the defendant, the cited conduct portrays the co-defendant as a person who (1) attempts, with limited success, to get young men to join her in very serious criminal endeavors and when they decline she commits the crime on her own and then blames them, or (2) upon obtaining no assistance she fails to go forward with her plans and then threatens the young men not to tell on her, or (3) she commits a crime and falsely accuses a third party of doing the crime, or (4) has given an individual, who failed on three occasions to join with her in a crime, a substance believed to be life-threatening.

> The defendant gave a statement to the police in which he sets forth in considerable detail his participation in the charges before the court.  He admits that at the request of the co-defendant he joined her in an attempt to rob the victim.  He admits that thereafter he engaged in certain activities, including refusing to release the victim from the holding cell, stuffing materials under the cell door, which caused the cell to fill with water, blocking the door with furniture and paint cans, and inserting a hose from his car's exhaust into what he believed was the air vent to the holding cell.  He admits knowingly leaving the victim in the holding cell for two days.  Assuming the People's case is consistent with the defendant's admission, the court fails to see the materiality of the

purported conduct that the co-defendant has a history of committing crimes and until she joined with the defendant, an unsuccessful history of getting others to join with her. Herein, by the defendant's own admission he agreed to join with her in the endeavor to rob the victim. The court cannot see anything, at present... that is material in the instant case on the defendant's intent to commit the crimes that he is charged with, in the absence of the issue of duress or fear which is discussed below. In the event, however, that the People's case sets forth evidence or theories of the case, inconsistent with the defendant's admission, the court reserves jurisdiction to revisit the issue.

As to the defendant's contention that he was unable to extricate himself from the situation because of fear of the co-defendant's retaliation, there must be some evidence that the defendant knew of her reputation prior to the subject incident. The defendant has indicated he will not be testifying and there is nothing in his statement to the police that supports such a contention. There is no indication that any other evidence would be [properly] submitted, in the absence of the defendant's testimony, that would support the contention that the defendant knew of the co-defendant's reputation for retaliation or ability to manipulate facts to cause guilt to fall on other person, prior to the incident in question. In the absence of such evidence, there is no legitimate basis for the receipt of the proposed evidence. In the event, the defendant chooses to testify, the court reserves jurisdiction to revisit the issue. Alternatively, if the defendant is suggesting that the evidence is relevant on the contention that he was suffering from duress or was somehow duped into performing the activities in question, the court notes that neither contention was mentioned by the defendant in his statement to the police. As such, in the absence of the defendant testifying or alternatively some other admissible evidence that brings that issue before the court, evidence of the co-defendant's past conduct is not admissible.

(CT at 193-95.)

As explained by the trial court, the proffered evidence was lacking in probative value, given petitioner's comprehensive admissions and decision not to testify. The lack of probative value justified exclusion of the additional witness testimony. *See Alcala*, 4 Cal.4th at 788. Petitioner's trial was not rendered fundamentally unfair by the exclusion of witness testimony relating to Rugg's prior acts.

4. Witness Immunity/ Prosecutorial Misconduct

For his fourth and final additional ground to the cumulative error claim, it appears

that petitioner is alleging that he was denied the right to present the testimony of witness Erin Hughes due to misconduct on the part of the prosecutor. Petitioner implies that the prosecutor declined to grant Hughes immunity in order to prevent her from giving testimony which would have been helpful to the defense.

It is well-settled that the constitution does not "provide [ ] a defendant with a right to demand use immunity for defense witnesses who invoke their privilege against self-incrimination." *United States v. Brutzman*, 731 F.2d 1449, 1451-52 (9th Cir. 1984) (*overruled on other grounds* by *United States v. Booth*, 309 F.3d 566 (9th Cir. 2002)). "[T]he prosecution's refusal to grant use immunity to a defense witness denies the defendant a fair trial only when (1) the witness's testimony would have been relevant, and (2) the prosecution refused to grant the witness use immunity with the deliberate intention of distorting the fact-finding process. *Williams v. Woodford*, 384 F.3d 567, 600 (9th Cir. 2004). To demonstrate the prosecutorial misconduct of the second prong, a petitioner must show that the prosecution intentionally caused a defense witness to invoke the Fifth Amendment right against self-incrimination, or that the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness. *Id*.

In this case, Hughes was not called to testify by the prosecution, nor was she granted use immunity. Upon close of the prosecution's case, the defense considered calling Hughes as a witness and, to that end, a hearing was conducted outside the presence of the jury regarding potential issues relating to the privilege against self-incrimination. (RT at 520-27.) Hughes was represented by her own attorney as she was questioned by defense counsel. (RT at 521.) At one point she was apparently advised by her attorney to exercise the Fifth Amendment privilege to refuse to testify. (RT at 524.) Defense counsel terminated questioning after determining that Hughes was not going to answer any questions regarding events that took place after Hamman was locked in the cell. (RT at 527.) Ultimately, Hughes did not testify before the

1   jury for the prosecution or the defense.  (RT at 527.)

2          Assuming that Hughes' testimony would have satisfied the minimal requirement

3   of being relevant, petitioner has not demonstrated the requisite prosecutorial misconduct under

4   the second prong.  Petitioner does not contend that the prosecution granted immunity to

5   prosecution witnesses, while denying immunity to defense witnesses.  Nothing in the record

6   supports an argument that the prosecution attempted to distort the fact-finding process or took

7   affirmative steps to prevent Hughes from testifying.  Rather, citing *People v. Irvin*, 22 Cal.4th 48

8   (2000) for the applicable state law, the prosecutor indicated that his discretionary decision not to

9   grant immunity to Hughes was based on his concern that she intended to give perjured testimony.

10  (RT at 517.)  The record supports the prosecutor's assertion to the extent that Hughes originally

11  told police the kidnaping and robbery was planned out in advance at the motel, but later told

12  defense investigators that the events happened spontaneously.  (RT at 517-518.)   Additionally,

13  Hughes intended to testify that neither she nor petitioner were present when Hamman was locked

14  in the cell (RT at 524), which was inconsistent with petitioner's admissions.  It appears that the

15  prosecutor was justified in declining to grant Hughes use immunity based on concerns that she

16  intended to perjure herself (*see People v. Ervin*, 22 Cal.4th 48, 80-82 (2000) (purpose of use

17  immunity is to secure truthful testimony, not to license perjury)), and there is no evidence that

18  her subsequent decision not to testify was based on anything other than her concern about

19  exposure to potential criminal liability.

20          In sum, petitioner has failed to demonstrate error of constitutional magnitude with

21  respect to the additional grounds alleged in this claim of his petition.  These alleged errors,

22  considered cumulatively with the first four grounds of this petition, did not affect the fairness of

23  his trial.  The constitution demands only a fair trial and not a perfect one.  *Delaware v. Van*

24  *Arsdall*, 475 U.S. 673, 681 (1986).  Petitioner is not entitled to relief on his claim of cumulative

25  error.

26  /////

## V.  CONCLUSION

For all the foregoing reasons, petitioner's application for writ of habeas corpus is hereby DENIED.

Dated: May 5, 2009

_Charlene H. Sorrentino_
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE